**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ANTONIO MORA-MERAZ,
                *Petitioner-Appellant,*

v.

J. E. THOMAS, Warden, FCI
Sheridan,
                *Respondent-Appellee.*

No. 09-35413

D.C. No.
3:08-cv-00709-HA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, Senior District Judge, Presiding

Argued and Submitted
March 3, 2010—Portland, Oregon

Filed April 14, 2010

Before: Richard A. Paez, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Tallman

## COUNSEL

Stephen R. Sady, Lynn Deffebach (argued), Office of the Federal Public Defender for the District of Oregon, Portland, Oregon, for the petitioner-appellant.

Kent S. Robinson, Kevin Danielson, Suzanne A. Bratis (argued), Office of the United States Attorney for the District of Oregon, Portland, Oregon, for the respondent-appellee.

## OPINION

TALLMAN, Circuit Judge:

Antonio Mora-Meraz ("Mora-Meraz"), a federal prisoner in the custody of the United States Bureau of Prisons (the "Bureau"), appeals the denial of his § 2241 petition for habeas corpus relief. He was convicted of possession of cocaine with the intent to distribute, and was sentenced to 120 months of incarceration. In the district court, he challenged the Bureau's decision to deny him eligibility for admission to the Residential Drug Abuse Program (the "RDAP") at the Federal Correctional Institution at Sheridan, Oregon.

The RDAP is an intensive drug abuse program requiring a minimum of 500 hours of treatment apart from the general prison population. Program Statement 5330.10, Chapter 5.1.[1] The program utilizes both individual and group therapy sessions and lasts for six to twelve months. *Id.* Additionally,

---

[1]The Bureau has subsequently repealed Program Statement 5330.10, and has now issued new policy statements governing psychology treatment programs and RDAP early release benefit procedures. However, these new policy statements took effect on March 16, 2009, and are not retroactive. Because Program Statement 5330.10 was in effect during the Bureau's evaluation of Mora-Meraz, it is the relevant program statement for this case.

individuals enrolled in the RDAP are required to complete transitional courses in a community-based program once placed in a halfway house or on supervised release. *Id.* The RDAP is attractive to prisoners because, as an incentive to participate in substance abuse rehabilitation, it grants up to one year sentence credit to those who successfully complete it.

Before the district court, Mora-Meraz claimed that the Bureau's unwritten requirement that he present documented proof of substance use within twelve months of imprisonment was invalid because it was not subject to notice and comment as required by the Administrative Procedure Act ("APA"), and because the Bureau failed to articulate a rational explanation for the requirement. We hold that the Bureau did not run afoul of the APA's procedural requirements and affirm the district court's denial of Mora-Meraz's petition for habeas corpus.[2]

## I

### A

Congress has outlined the terms of federal imprisonment in 18 U.S.C. § 3621. In 1990, the statute was amended to direct the Bureau to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." Pub. L. 101-647, § 2903, 104 Stat. 4789, 4913 (1990) (codified at 18 U.S.C. § 3621(b)).

---

[2]Counsel represented at oral argument that Mora-Meraz has since been transferred to a halfway house to serve the last six months of his custodial sentence. Although he can no longer participate in the prison-based RDAP, he argues that this appeal is not moot because, if he prevails, he will seek a one-year reduction in his overall sentence. Because we deny his claims on the merits, we need not decide whether the relief he requests is nonetheless available based on his current custodial status.

The Violent Crime Control and Law Enforcement Act of 1994 also partially amended 18 U.S.C. § 3621. Under this revision, eligible prisoners are able to participate in substance abuse programming and treatment available while incarcerated in federal institutions. Pub. L. No. 103-322, § 32001, 108 Stat. 1796, 1896-97 (1994) (codified at 18 U.S.C. § 3621(b)(5), (e)). An inmate may be "eligible" for a program such as the RDAP if he is (1) "determined by the Bureau of Prisons to have a substance abuse problem," and (2) "willing to participate in a residential substance abuse treatment program." 18 U.S.C. § 3621(e)(5)(B). As "an incentive . . . to draw into treatment many inmates who may otherwise not be willing to undergo a difficult and painful treatment program," Congress allowed for a potential one-year sentence reduction upon successful completion of the RDAP. H.R. Rep. No. 103-320, at 5 (1993); 18 U.S.C. § 3621(e)(2)(A), (B).[3]

The Bureau promulgated a regulation further defining eligibility for the RDAP.[4] This regulation read, in relevant part:

> (a) Eligibility. An inmate must meet all of the following criteria to be eligible for the residential drug abuse treatment program.
>
> > (1) The inmate must have a verifiable documented drug abuse problem.

---

[3]The incentive provision in § 3621 reads: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve." 18 U.S.C. § 3621(e)(2)(B).

[4]The regulation has been revised several times and has been amended again since Mora-Meraz was evaluated. Because drug abuse program rules are prospective in nature, see Bowen v. Hood, 202 F.3d 1211, 1220-21 (9th Cir. 2000); Cort v. Crabtree, 113 F.3d 1081, 1085 (9th Cir. 1997), the 2008 version is the appropriate regulation to review in this case.

28 C.F.R. § 550.56(a) (2008). Neither the statute nor the regulation defines "verifiable documented drug abuse problem."

The Bureau has issued a program statement explaining how it determines whether an inmate has a "verifiable documented drug abuse problem." Under Program Statement 5330.10, Chapter 5.4.1(a)(1), eligibility is based on multiple components. "[D]rug abuse program staff shall . . . conduct[ ] the Residential Drug Abuse Program Eligibility Interview followed by a review of all pertinent documents in the inmate's central file to corroborate self-reported information." Program Statement 5330.10, Chapter 5.4.1(a)(1). "The inmate must meet the diagnostic criteria for substance abuse or dependence indicated in the Diagnostic and Statistical Manual of the Mental Disorders, Fourth Edition, (DSM — IV)." *Id.* Furthermore,

> there must be verification in the Presentence Investigation . . . report or other similar documents in the central file which supports the diagnosis. Any written documentation in the inmate's central file which indicates that the inmate *used* the *same substance*, for which a diagnosis of abuse or dependence was made via the interview, shall be accepted as verification of a drug abuse problem.

*Id.*

Since the Bureau bases its substance abuse or dependence diagnosis on the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition Text Revision (2000) ("DSM-IV"), it is important to understand how the DSM-IV classifies substance abuse and dependence. The DSM-IV defines dependence generally as "a cluster of cognitive, behavioral, and psychological symptoms indicating that the individual continues use of the substance despite significant substance-related problems." DSM-IV, at 192. Specifically, the DSM-IV defines dependence as "three or more of the [following] symptoms . . . occurring at any

time in the same 12-month period": tolerance; withdrawal; increased amount of a substance or elevated duration of ingestion; unsuccessful attempts to cease use; escalated time expenditure securing, using, and recovering from the substance; reduction in outside activities; or continued use despite awareness of the consequences. *Id.* at 192-94. It defines substance abuse similarly to substance dependence, but substance abuse "do[es] not include tolerance, withdrawal, or a pattern of compulsive use and instead include[s] only the harmful consequences of repeated use." *Id.* at 198.

Once dependence or substance abuse has been established, an individual can enter one of the stages of remission if none of the symptoms listed above are present for one month. *Id.* at 195. The DSM-IV uses "specifiers" to qualify the quality and degree of remission. The quality of remission is categorized as either "Early" or "Sustained," and the degree is either "Partial" or "Full."

> Because the first 12 months following Dependence is a time of particularly high risk for relapse, this period is designated Early Remission. After 12 months of Early Remission have passed without relapse to Dependence, the person enters into Sustained Remission. For both Early Remission and Sustained Remission, a further designation of Full is given if no criteria for Dependence or Abuse have been met during the period of remission; a designation of Partial is given if at least one of the criteria for Dependence or Abuse has been met, intermittently or continuously, during the period of remission.

*Id.* at 192. However, these remission specifiers are not applicable if a person is either on a prescribed agonist medication, such as methadone, or in a controlled environment "where access to alcohol and controlled substances is restricted," such as "closely supervised and substance-free jails." *Id.* at 197.

In addition to the interview with an inmate to evaluate his subjective claims of dependency or abuse, Bureau staff are required to review the inmate's central file and assess whether documented proof supports any initial diagnosis. *See* Program Statement 5330.10, Ch. 5.4.1(a)(1) (stating that following an interview where a diagnosis of dependence or substance abuse is made, any written documentation in an inmate's file which indicates that he or she used the same substance for which that diagnosis was made shall be accepted as verification of that drug abuse problem).

Furthermore, although the regulation and program statement set forth these requirements, the Bureau has also adopted an unwritten policy which mandates that the prisoner's file confirm that the inmate used the same substance within twelve months prior to incarceration. While the central file, including the PSR, might show use of the same substance at some point during an inmate's past, the Bureau requires, that to be eligible for the RDAP, the inmate must show substance dependence or abuse within his last twelve months "on the street."[5]

## B

On February 4, 2002, Mora-Meraz was convicted of possession with the intent to distribute 13.32 kilograms of cocaine in the United States District Court for the Southern District of Texas after he and his daughter were caught carrying drugs across the Mexican border. He was sentenced to a term of 120-months incarceration with the Bureau and five additional years of supervised release. He was imprisoned at

---

[5]It is important to note that the RDAP is not the only substance abuse treatment program offered at the Federal Correctional Institution at Sheridan. However, it is the only program offering a potential reduction in an inmate's prison sentence upon successful completion of the program. The twelve-month rule appears to be applicable only to those individuals seeking placement in the intensive RDAP. Mora-Meraz has participated in a non-residential drug abuse treatment program at Sheridan.

the Federal Correctional Institution at Sheridan, Oregon, and is now residing at a halfway house while completing the remainder of his custodial sentence. With credit for good conduct time, his projected release date is November 22, 2010.

A probation officer conducted an investigation prior to Mora-Meraz's sentencing. The presentence investigation report ("PSR") presented to the district court only briefly mentions a history of substance abuse. In its entirety, this section of the report states:

> Mora-Meraz reported that he tried marihuana [sic] at the age of thirteen, and has never smoked marihuana [sic] again. He also admitted to having tried cocaine once in 1982. The defendant denied any substance abuse issues, and did not believe he would benefit from treatment.

Mora-Meraz claims that this statement under-represents his actual drug abuse problems and that fear of a harsher sentence caused him to misrepresent his actual prior drug abuse history to both the probation officer and judge.

On January 10, 2008, Mora-Meraz was interviewed by Dr. Neil Solomon, the Bureau's drug abuse program coordinator at Sheridan, to determine his eligibility for the RDAP. During this interview, Mora-Meraz insisted that he had actually used alcohol once per week for the past thirty-one years, and that his heaviest use was between the ages of 25 and 40. He admitted to having used cocaine more than once per week over the past seventeen years, and that his heaviest use had occurred since his 35th birthday. Finally, he said that he had used marijuana in the past twenty-six years, but not with any frequency. He claimed that he drank alcohol and used cocaine "more than once a week, but not daily" during the "last . . . twelve consecutive mo[nth] period on the street."

Though Dr. Solomon recorded that his "diagnostic impression" was negative for either substance abuse or dependence,

MORA-MERAZ v. THOMAS                                    5601

on September 12, 2008, another Bureau drug abuse treatment specialist noted that, based on Mora-Meraz's self-reporting and a review of the DSM-IV, he would be diagnosable as suffering from both alcohol and cocaine dependence. The Bureau then developed a substance abuse treatment plan for Mora-Meraz which identified problems, goals, and activities for advancement. Mora-Meraz sought admission to the RDAP, but was subsequently denied admittance because neither his PSR nor the remainder of his central file contained documentation of either alcohol or cocaine use during the twelve months prior to incarceration.

Mora-Meraz filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2241, alleging that the Bureau had impermissibly denied him admission into the RDAP. He claimed that the Bureau's unwritten requirement that a prisoner provide documentation of substance use within the twelve months prior to incarceration was an improper limitation on admittance to a statutorily-created program. After appointing counsel from the Federal Public Defender's Office, the district court denied Mora-Meraz's petition on March 30, 2009.

The court considered whether the so-called "twelve-month rule" was an invalid exercise of the Bureau's discretion under the applicable statutes and regulations. The district court was also asked to determine whether the twelve-month rule violated the APA. The court answered both questions in the negative, finding first that the rule was reasonable under the applicable statutes and regulations because it relied on the DSM-IV's definition of substance dependence, and second that the rule was not subject to notice and comment because it was an interpretive rule under *Reno v. Koray*, 515 U.S. 50 (1995). It concluded that Mora-Meraz had failed to show that the Bureau abused its discretion in denying him admittance to the RDAP.

Mora-Meraz v. Thomas

Mora-Meraz then filed this timely appeal challenging only the district court's determination that the twelve-month rule is an interpretive rule and thus is not subject to the procedural requirements of the APA.[6] We are asked to decide whether the twelve-month rule must comply with the APA's procedural requirements including (1) the need for an agency to provide ample notice and time for comment, and (2) an agency's explanation of its rationale for adopting a particular rule.

## II

"We review de novo a district court's decision granting or denying a petition for a writ of habeas corpus filed pursuant to [28 U.S.C.] § 2241." *Wilson v. Belleque*, 554 F.3d 816, 828 (9th Cir. 2009). Also, "[w]hether an agency pronouncement is interpretive or substantive is a legal question that we review de novo." *Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001). Finally, "[i]n reviewing the Bureau's conduct, we consider whether the agency's promulgation of the . . . rule is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (quoting 5 U.S.C. § 706(2)(A)). "We must review the agency action based solely on the administrative record 'and determine whether the agency has articulated a rational basis for its decision.' " *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (quoting *Tablada v. Thomas*, 533 F.3d 800, 805 (9th Cir. 2008)).

## III

Mora-Meraz challenges two distinct requirements within the APA. First, he argues that the Bureau neglected to follow the notice and comment requirements set forth under 5 U.S.C. § 553(b). Second, he insists that even if the notice and comment requirements were met, the Bureau failed to provide an

---

[6]Mora-Meraz does not appeal the district court's reasonableness determination.

adequate articulated rationale for its promulgation of the twelve-month rule. This, he says, requires that we find the rule "arbitrary and capricious" in violation of § 706 of the APA. We discuss each claim in turn.

## A

**[1]** The APA places procedural requirements on an agency when it seeks to issue a rule. These procedures include: (1) publication of notice of the proposed rule in the *Federal Register*, 5 U.S.C. § 553(b); (2) a period for interested individuals to comment on the proposed rule, *id.* § 553(c); and (3) publication of the adopted rule not less than thirty days before its effective date, *id.* § 553(d). *Paulsen v. Daniels*, 413 F.3d 999, 1004 (9th Cir. 2005). " 'In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment.' " *Id.* (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979)).

**[2]** However, these notice and comment requirements are not applicable to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). We have made a distinction between so-called "substantive rules" or "legislative rules" and "interpretive rules." "Generally, agencies issue interpretive rules to clarify or explain existing law or regulations so as to advise the public of the agency's construction of the rules it administers." *Gunderson*, 268 F.3d at 1154. However, "[i]f a rule is inconsistent with or amends an existing legislative rule, then it cannot be interpretive." *Id.* This is because a rule that is inconsistent with a rule promulgated subject to notice and comment would impose new rights or obligations and would require compliance with the § 553 procedures.

**[3]** Our first question is whether the Bureau's twelve-month rule is substantive—requiring notice and comment—or

interpretive—exempt from notice and comment under
§ 553(b)(3)(A). We have said that the regulation governing
the RDAP, in this case 28 C.F.R. § 550.56(a) (2008), is
clearly substantive, because it "effect[s] a change in existing
law or policy." *Gunderson*, 268 F.3d at 1154 (internal quota-
tion marks omitted)). However, we have not said the same
regarding the Bureau's Program Statement or this specific
unwritten rule. Hence, in order to determine whether the chal-
lenged rule is substantive, we must ask: "what does the
twelve-month rule do?" *See id.*

Mora-Meraz argues that because the twelve-month rule
requires agency staff to disqualify any prisoner whose prior
use of drugs within the twelve months preceding incarceration
is not documented, the rule is categorical and allows for no
exceptions or individualized assessment. This, he says, is the
indicative mark of a substantive eligibility rule and not of an
interpretive rule. We disagree and hold that because the
twelve-month rule is not inconsistent with the regulation and
instead only seeks to clarify language within the regulation,
it is a valid interpretive rule and need not comply with § 553's
requirements.

**[4]** Title 18 U.S.C. § 3621 clearly states that the Bureau is
to determine who is eligible for the RDAP. 18 U.S.C.
§ 3621(e)(5)(B)(i) (stating that one condition of eligibility is
a finding by the Bureau that the inmate has a substance abuse
problem). To do so, the Bureau promulgated 28 C.F.R.
§ 550.56 (2008), which in part compelled the prisoner to show
a "verifiable documented drug abuse problem." *Id.*
§ 550.56(a)(1). It then defined "verifiable" within its program
statement, requiring that an inmate establish documented evi-
dence of use of the same substance to corroborate a diagnosis
of abuse or dependence consistent with the DSM-IV. Program
Statement 5330.10, Chapter 5.4.1(a)(1). In turn, the DSM-IV
states that a person is in "Sustained Full Remission" if he
exhibits no criteria of abuse or dependence within a twelve-
month period, but that remission cannot occur if an individual

has been incarcerated in a "closely supervised and substance-free jail[ ]." DSM-IV, at 195, 197. The requirement that an inmate have documented proof that he is a drug abuser who is not in remission at the time he enters a correctional institute flows directly from the DSM-IV. Therefore, the twelve-month rule challenged by Mora-Meraz does "no more than clarify or explain existing law" regarding what it means to have a "verifiable documented drug abuse problem" under 28 C.F.R. § 550.56(a)(1). *Gunderson*, 268 F.3d at 1155 (internal quotation marks omitted).

**[5]** Because the twelve-month rule is an interpretive rule and the Bureau need not follow notice and comment procedures, it was not error for the district court to deny Mora-Meraz's petition on this ground.

## B

**[6]** In addition to the notice and comment requirements, the APA also directs that we must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, our review of the [Bureau's] regulation is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.' " *Crickon*, 579 F.3d at 982 (quoting *N.W. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).

In *Arrington*, we explained that "[a] reasonable basis exists where the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.' " 516 F.3d at 1112 (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005) (internal citation omitted)). We are not permitted to "supply a reasoned basis for the agency's action that the agency itself has not given." *Crickon*, 579 F.3d

at 982. We also may not read into the agency's silence and
make inferences thereupon. *Id.* "However, even when an
agency explains its decision with less than ideal clarity, a
reviewing court will not upset the decision on that account if
the agency's path may reasonably be discerned." *Id.* (internal
quotation marks omitted). Our job is to rely upon "the admin-
istrative record to determine whether the agency has articu-
lated a rational basis for its decision." *Arrington*, 516 F.3d at
1112. If an agency fails to articulate a rationale, we must find
that its actions do not comply with the APA. *Crickon*, 579
F.3d at 987.

The government argues that because the twelve-month rule
is interpretive in nature, it need not comply with the
articulated-rationale requirement under § 706. On the other
hand, Mora-Meraz claims that our case law declares that all
agency rules, whether substantive or interpretive, must com-
ply with this requirement. He relies on a footnote in *Crickon*,
where he insists that we invalidated the requirements set forth
in a program statement because the Bureau did not provide an
articulated rationale as required under § 706. *See id.* at 988
n.11. Mora-Meraz's argument is misguided. While we did
consider the impact of the Bureau's failure to articulate a
rationale with regard to the requirement at issue there, our dis-
cussion of the program statement was in the context of *Skid-
more* deference and not an analysis under § 706. *Id.*
Therefore, that case has no bearing on whether interpretive
rules are subject to § 706's articulated rationale requirement.

Though the parties focus on this argument, it is not one we
need to resolve here because we hold that the Bureau did, in
fact, set forth an adequate explanation for the twelve-month
limitation on RDAP eligibility. Therefore, we need not deter-
mine whether interpretive rules are always subject to the
articulated-rationale requirement.

**[7]** The question we evaluate is whether the Bureau "con-
sidered the relevant factors and articulated a rational connec-

tion between the facts found and the choices made."
*Arrington*, 516 F.3d at 1112 (internal quotation marks omit-
ted). Mora-Meraz claims that the Bureau gave no explanation
for its decision to condition RDAP eligibility on documented
proof of substance use within the twelve months prior to
incarceration. However, we conclude that the requisite "ratio-
nal connection" was made by the agency when it incorporated
the provisions of the DSM-IV as its benchmark for determin-
ing whether an inmate suffers from diagnosable substance
abuse or dependence. Program Statement 5330.10, Chapter
5.4.1(a)(1).

Mora-Meraz does not challenge the Bureau's decision to
reference the DSM-IV. Instead, he argues that the Bureau
failed to clearly articulate its reasons for imposing a temporal
limitation on when an individual last ingested drugs or alco-
hol. More specifically, he claims that the rule that an inmate
show documented proof of use within twelve months of incar-
ceration was implemented without the Bureau giving the req-
uisite explanation. One glance at the governing regulation, 28
C.F.R. section 550.56, illustrates why the drug abuse problem
must be documented, and a close reading of the DSM-IV
explains the rationale for imposing the twelve-month tempo-
ral limitation.

First, with regard to the documentation requirement, the
regulation in effect at the time read: "The inmate must have
a verifiable *documented* drug abuse problem." 28 C.F.R.
§ 550.56(a)(1) (emphasis added). Therefore, it is no surprise
that the Bureau directs the inmate to provide evidence corrob-
orating his alleged drug abuse or dependence problem either
within the PSR or the remainder of his central file.

Second, the Bureau's reason for selecting a twelve-month
window—and more specifically the twelve months prior to
incarceration—is apparent from the DSM-IV. The DSM-IV
explains that the "cessation of Dependence" occurs when the
individual enters "Remission." DSM-IV, at 195. A person is

said to be in remission if "none of the criteria for Substance
Dependence or Substance Abuse have been present for at
least 1 month." *Id.* However, "the first twelve months follow-
ing Dependence is a time of particularly high risk for
relapse," and a person is not said to be in "Sustained Full
Remission" until the end of that twelve-month phase. *Id.* at
195-96. Once an individual passes the twelve-month mark, he
is in Full Remission, defined by the DSM-IV as occurring
when "[t]here are no longer any symptoms or signs of the dis-
order, but it is still clinically relevant to note the disorder." *Id.*
at 2. While this is not the same as "recovered," an individual
in Full Remission is not in need of medical intervention other
than continued evaluation. *Id.*

   **[8]** Following the DSM-IV analysis, the Bureau's rationale
for imposing the twelve-month rule is reasonable. Without
documented proof that an inmate has used an offending drug
within twelve months prior to incarceration, it is reasonable
to infer that the inmate is no longer dependant or an abuser.
*Id.* at 195. It follows that such an individual has no need for
the highly intensive residential drug treatment program,
RDAP. If the individual believes he still has a need for treat-
ment and assistance, he may enroll in a less comprehensive
program offered in the prison.

   Furthermore, following the DSM-IV, the remission specifi-
ers do not apply once an individual is incarcerated. This
makes sense. A person in a substance-free prison does not
have access to his or her drug of abuse. While incarcerated,
the individual may not exhibit the symptoms of abuse or
dependence—ingesting the drug, reducing outside activities,
escalated time expended securing the drug, etc.—but there is
no way to determine whether this cessation is truly an indica-
tion of remission or simply an externally imposed conse-
quence. Thus, the relevant time period the Bureau uses to
assess whether an inmate is diagnosable as suffering from
substance abuse or dependence is the twelve months prior to
incarceration.

MORA-MERAZ v. THOMAS                    5609

**[9]** Here there exists a reasonable basis for the Bureau's decision to adhere to the DSM-IV's twelve-month rule and a reasonable basis for the Bureau to apply that rule to require documented use of a drug within the twelve months prior to incarceration. Therefore, we conclude that the Bureau's implementation of the twelve-month rule was neither arbitrary nor capricious under § 706.

## IV

Congress realized the pressing need for extensive drug abuse treatment programs within our federal prisons. To ensure that inmates receive crucial treatment for their addictions, Congress provided an incentive for individuals to subject themselves to the rigors of an intensive residential treatment program. But the Bureau is properly concerned with enrolling inmates who genuinely qualify for the therapy and its attending incentive to successfully complete the RDAP. Prisoners who are not currently suffering from a clinically diagnosed drug dependency or a recognized substance abuse problem under the DSM-IV protocols should not be permitted to take the place of another who is in greater need of this intensive treatment. The Bureau's rationale for confirming a diagnosis of drug abuse or dependence is clear. The district court correctly denied habeas corpus relief to Mora-Meraz.

**AFFIRMED.**